UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

LATIFA S. WRIGHT O/B/O J.T.W.,    )    Civil Action No.: 4:20-cv-01668-TER
            Plaintiff,    )
                   )
    -vs-           )          ORDER
                   )
ANDREW M. SAUL,      )
Commissioner of Social Security;    )
                   )
        Defendant.    )

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for child's supplemental security income.[1] The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This action is proceeding before the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Proc. R. 73.

## I. RELEVANT BACKGROUND

### A. Procedural History

Plaintiff filed an application for SSI on March 14, 2017,[2] with alleged disability onset date of January 8, 2014. (Tr. 12). The claim was denied initially and upon reconsideration. A hearing was held on April 11, 2019. The Administrative Law Judge (ALJ) issued an unfavorable decision on May 31, 2019, finding that Plaintiff was not disabled within the meaning of the Act. (Tr. 25). Plaintiff filed a request for review of the ALJ's decision. The Appeals Council denied the request

---

[1] Plaintiff is used interchangeably, referring to both the minor child and her mother.

[2] The Listings requirements were changed effective March 27, 2017 and those changes are not applicable here.

for review on March 8, 2020, making the ALJ's decision the Commissioner's final decision. (Tr.1-3). Plaintiff filed this action on April 28, 2020. (ECF No. 1).

**B.    Plaintiff's Background and Medical History**

    **1.    Introductory Facts**

Plaintiff was an older infant when the SSI application was filed and a preschooler at the time of the ALJ's decision. (Tr. 15). Plaintiff had severe impairments of ADHD and unspecified disruptive, impulse control, and conduct disorder. (Tr. 15).

    **2.    Records**

**2015**

On November 16, 2015, Plaintiff, aged two years and ten months, was seen by her pediatrician Dr. Keith. Plaintiff's mother reported significant behavior problems and violence trying to hurt her newborn brother. (Tr. 348). There was no mental exam. (Tr. 349). Diagnosis was childhood onset type conduct disorder. (Tr. 349). Plaintiff was referred to counseling.

On November 18, 2015, Plaintiff was first seen for therapy. Plaintiff's mother reported that she wanted Plaintiff to be happy, but Plaintiff rarely smiled, always seeming mad. Plaintiff's misbehavior started when her brother was born. (Tr. 289).

On November 23, 2015, Plaintiff was seen for therapy with her sister. (Tr. 286). Plaintiff was pleasant, agreeable, and sometimes shy. "They got along well." (Tr. 286). Both stayed within limits set by the counselor. (Tr. 286). Plaintiff was progressing. (Tr. 286).

On December 2, 2015, Plaintiff was seen for therapy. (Tr. 283). Plaintiff's mother showed a video of Plaintiff biting her sister. Plaintiff's mother was provided with reading materials, guidelines, and behavior chart. (Tr. 283). Progress was variable. (Tr. 284).

2

On December 8, 2015, Plaintiff was seen for therapy. Plaintiff had done well with good behavior chart, but Plaintiff's mother had not seen decrease in misbehaviors. Alternatives for hitting were suggested. (Tr. 281). Plaintiff was assertive at times, curious, easily engaged, and cooperative. (Tr. 281). Plaintiff complied with prompting to be gentle when cleaning. Play was appropriate with daily living. (Tr. 281). Plaintiff was progressing. (Tr. 282).

On December 15, 2015, Plaintiff was seen for therapy with her sister. Plaintiff was easily engaged, cooperative, and pleasant. They practiced being quiet while a baby like brother slept. (Tr. 279). Progress was progressing. (Tr. 280).

On December 22, 2015, Plaintiff was seen for therapy. (Tr. 277). Plaintiff's mother reported more aggression over the last week. Plaintiff was more vocal after her mother left the session. Plaintiff was compliant in using more words to ask for things. (Tr. 277). Progress was listed as variable. (Tr. 278).

**2016**

On January 11, 2016, Plaintiff was seen for therapy. Plaintiff's mother reported Plaintiff was doing much better with decreased aggression and using the behavior chart. In session, Plaintiff was encouraged to use words. (Tr. 274).

On January 25, 2016, Plaintiff was seen for therapy. (Tr. 272). Plaintiff's mother reported Plaintiff regressed with behaviors. Plaintiff's mother was encouraged to use the behavior chart more effectively. During play, Plaintiff's behaviors were shaped to be more gentle and less aggressive with talking about consequences of hitting versus keeping hands to self. (Tr. 272).

On February 1, 2016, Plaintiff was seen for therapy. (Tr. 270). Plaintiff's mother reported Plaintiff continued to behave impulsively very often. In session, Plaintiff was compliant and easily

3

engaged. (Tr. 270).

On February 10, 2016, Plaintiff was seen for therapy. Plaintiff had irritable mood. (Tr. 268). Plaintiff's mother reported Plaintiff continued to hit others. First, Plaintiff was shut down then was compliant and easily engaged. Play therapy was conducted about how to use words. (Tr. 268).

On February 22, 2016, Plaintiff's therapist noted Plaintiff continued with aggressive behavior. Plaintiff's mother reported the neurologist ruled out medical reasons for behavior. (Tr. 264). Continuation of therapy was recommended. (Tr. 264). Plaintiff's mother reported Plaintiff was out of control and was angry all the time. (Tr. 265). Plaintiff warmed up after several minutes of her mother being gone. Plaintiff needed prompting to engage but was cooperative. (Tr. 266). Work was done on identifying feelings.

On March 7, 2016, Plaintiff was seen for therapy. (Tr. 190). Diagnosis was adjustment disorder. Plaintiff had euthymic, depressed mood. Plaintiff was quiet and engaged very little. However, alone, without mother, Plaintiff was verbal and easily engaged. (Tr. 190). Goals and methods were discussed.

On March 21, 2016, Plaintiff was seen in therapy. Plaintiff had irritable mood, constricted affect, and was withdrawn. Plaintiff's father reported continued aggression. (Tr. 192). Plaintiff was resistant most of the session, refused to play, and laid on the floor.

On April 4, 2016, Plaintiff was seen for therapy. (Tr. 194). Plaintiff had euthymic mood, constricted affect, and intermittently interactive. Plaintiff's mother reported continued aggression. Plaintiff pouted for the first few minutes, but once her mother was gone, Plaintiff was cooperative. Plaintiff needed prompting to engage. Plaintiff stayed within limits and was easily engaged. (Tr. 194).

4

On April 11, 2016, Plaintiff was seen for therapy. (Tr. 196). Plaintiff had euthymic mood, appropriate affect, and was interactive. Plaintiff's mother reported that a psychiatrist said Plaintiff demonstrated anxiety, depression, and ADHD symptoms. Plaintiff's mother reported less aggression. Plaintiff was pleasant and easily engaged. (Tr. 196).

On April 18, 2016, Plaintiff was seen for therapy. Plaintiff had euthymic mood, appropriate affect, and was interactive. (Tr. 198). Plaintiff's father stated Plaintiff was aggressive less often. Plaintiff was receptive to play therapy and easily engaged. Plaintiff spanked dolls when they used the bathroom in their pants. Plaintiff also had dolls hitting each others and improved communication was discussed. (Tr. 198).

On April 25, 2016, Plaintiff was seen for therapy. (Tr. 200). Plaintiff had euthymic mood, appropriate affect, and was interactive. Plaintiff's mother reported progress and less aggression. Plaintiff was talkative, cheerful, and easily engaged. (Tr. 200). Plaintiff needed several prompts to stay within limits of play therapy. Plaintiff demonstrated appropriate play and less aggression. (Tr. 200).

On May 5, 2016, Plaintiff was seen for therapy. Plaintiff's mother reported regression with more aggression. Plaintiff's sister was in session and they did well overall, sharing and complying with the rules. Plaintiff had appropriate affect and was easily engaged. (Tr. 202). Behavior was appropriate and more of it was encouraged. (Tr. 202).

On May 22, 2016, Plaintiff was seen for therapy. Plaintiff's mother reported she was "out of control" and was angry all the time, beating the small dog, hitting her one year old brother, and hitting adults and children multiple times a day. Plaintiff pulls out her own hair when really angry. Plaintiff met all but the age requirement for disruptive mood dysregulation disorder. (Tr. 205).

Plaintiff's counselor went on maternity leave.

On June 28, 2016, Plaintiff was seen by Dr. Keith for her three year old checkup. Plaintiff was fully potty trained. Plaintiff used 3-4 sentences and spoke intelligibly to strangers over 75% of the time. Plaintiff interactively played with peers. (Tr. 344). Plaintiff had normal behavior/psychomotor activity exam. (Tr. 346).

On September 12, 2016, Plaintiff was seen for therapy due to no behavior progress over the summer. Plaintiff continued to display impulsive and aggressive behaviors towards siblings and dog. Plaintiff was not listening at school or home. Plaintiff was often withdrawn, not motivated, and with flat affect. Plaintiff's mother reported noticing ADHD behaviors. (Tr. 206). Plaintiff had distractible attention/concentration. Plaintiff had poor judgment/insight. Plaintiff had normal speech. Plaintiff used louder more audible speech than in the past. Plaintiff's mother reported after the last session discontinued, Plaintiff did well for the first month only. Plaintiff reported having no friends. Plaintiff's mother reported Plaintiff does not like school and had warnings for not listening. (Tr. 207).

On October 4, 2016, Plaintiff was seen for therapy. (Tr. 209). Diagnosis was rule out ADHD. (Tr. 210). Plaintiff's mother reported Plaintiff had recently thrown a glass hitting her sister's foot. Plaintiff was hyperactive, off task, and easily distracted in session.

On October 24, 2016, Plaintiff was seen for therapy. (Tr. 212). Plaintiff was fidgety and assertive but remained within limits after being verbally prompted. School reported Plaintiff was doing very well at school but not meeting a lot of goals. (Tr. 212).

On November 9, 2016, Plaintiff was seen for therapy. (Tr. 214). All siblings attended. "All children demonstrated attention seeking behaviors at times during the session." Plaintiff was clingy

but remained within limits after being verbally prompted. Plaintiff hit her brother one time; he hit her back. Plaintiff's mother reported nothing had changed. Plaintiff's mother reported she was not using the positive reinforcement chart. (Tr. 214).

On November 30, 2016, Plaintiff was seen for therapy. (Tr. 216). Plaintiff's mother reported Plaintiff continued to hit and kick siblings. Plaintiff was talkative, cheerful, and easily engaged. Plaintiff described what her family did to make her mad. Plaintiff was taught about breathing and about tearing a "mad monster" into pieces slowly. (Tr. 216).

On December 7, 2016, Plaintiff was seen for therapy. (Tr. 218). Plaintiff's mother reported Plaintiff was doing better keeping her hands and feet to herself but was still fidgety. In session, Plaintiff had difficulty holding new information with colors. (Tr. 218).

**2017**

On January 3, 2017, Plaintiff was discharged from therapy due to not being seen for nearly 30 days. Plaintiff made some progress on goals but still displayed impulsive and aggressive behaviors at home. (Tr. 221).

On January 18, 2017, Plaintiff was seen for therapy. Plaintiff recently spit in her sister's face. Plaintiff was talkative but compliant. Plaintiff needed a few prompts to stay within limits for play therapy. Plaintiff seemed to acknowledge understanding of good and bad behaviors. (Tr. 223).

On February 2, 2017, Plaintiff was seen for therapy with her sister. (Tr. 227). Plaintiff was initially guarded and responded very little. As the session continued, Plaintiff's mother became less frustrated and Plaintiff became more engaging. (Tr. 227). Plaintiff's mother wanted Plaintiff to tell the counselor about her negative behaviors; Plaintiff hid and looked down. The counselor encouraged positive feedback. During play therapy, siblings were 100% compliant with very little

7

verbal reminders given. (Tr. 227). Plaintiff missed the next three appointments. (Tr. 231). Plaintiff's

mother came in three hours late on March 8. (Tr. 232). Termination was dated March 8. (Tr. 233).

On March 7, 2017, Plaintiff was seen by Dr. Keith for her four year old checkup. Plaintiff

spoke intelligibly to strangers 100% of the time. Plaintiff had interactive play with peers and dressed

her self. (Tr. 340). Plaintiff had normal behavior/psychomotor activity exam. (Tr. 342).

On April 24, 2017, Plaintiff was evaluated by Dr. Goodwin, Ph.D. Plaintiff was almost four

years old.[3] (Tr. 240). Plaintiff was a full term pregnancy born a little under six pounds. Plaintiff's

mother reported that much of Plaintiff's speech was difficult to understand. (Tr. 240). Plaintiff

"appeared satisfied with the one to one attention, and she initiated interaction." (Tr. 240). Plaintiff

easily engaged in conversation about what she liked to play; articulation difficulties were noted.

Plaintiff's "activity level was higher in comparison to her same aged peers." (Tr. 240). Plaintiff often

became distracted and needed prompting and redirecting to some tasks. (Tr. 240). Overall effort was

good. (Tr. 241). The WPPSI-IV showed a full scale IQ of 64. (Tr. 241). Plaintiff's abilities on VCI

were in the borderline range. (Tr. 242).  Plaintiff was unable to accurately state how two objects were

similar. (Tr. 242). Plaintiff had a limited attention span. (Tr. 242). Plaintiff scored in the extremely

low range on the VSI as she was unable to manipulate blocks to copy a pattern, although she

demonstrated persistence and interest on that subtest. WMI showed borderline range, meaning she

was unable to retain information for short periods of time at a rate that is consistent with her same

aged peers. (Tr. 242). Plaintiff's scores showed Plaintiff may be hindered in ability to understand and

respond to tasks and directions. The VMI-6 showed Plaintiff at a year below her age and she was

---

[3] This is what the note stated as to Plaintiff's age; however, Plaintiff was born in January 2013 and was over four years old at this evaluation. It is unclear how much this error affected testing as to "same aged peers."

unable to copy shapes. The PRS and TRS, which was based on reports of others, showed significant concerns in all domains in the home setting. Plaintiff only had slight concern in social skills in school setting. (Tr. 243). "The overall ability score meets SCODE criteria for Developmental Delay in the area of cognition." (Tr. 244). The case was referred to the educational school-based staffing committee for placement considerations. (Tr. 244).

On March 20, 2017, a child function report was completed, presumably by Plaintiff's mother. (Tr. 134). Plaintiff did not converse with other children. Plaintiff could not answer questions about a short story. (Tr. 137). Plaintiff was withdrawn from her relatives and classmates. "Her speech is not clear enough at times for anyone to understand." Plaintiff does not process information as she should. (Tr. 137). For the question regarding understanding and using what Plaintiff learned, "no" was answered as to most abilities, such has know her age, recite numbers, and count three objects. (Tr. 138). It is stated that a counselor said she processed information as if she was two. Most all of the answers were "no" as to behavior with others, like showing affection, sharing, and playing games. (Tr. 139). It is reported when she is home she sits in the corner just sucking her thumb. (Tr. 139). As to ability to care for personal needs, the majority of answers were "yes;" however, Plaintiff's mother reported Plaintiff did not control bladder during the day or dress herself without help. (Tr. 140). Plaintiff was easily distracted with an inability to remain still for five minutes and was reported to hallucinate about bugs on her. (Tr. 140).

On July 18, 2017, Dr. Way, Ph.D., an examining consultant, reviewed a few of Plaintiff's records. (Tr. 245). Plaintiff was four. Plaintiff reported her age as three. Plaintiff's mother reported Plaintiff was applying for benefits due to her behavior difficulties and delayed skill development. (Tr. 245). Plaintiff's mother reported learning deficits. (Tr. 246). Dr. Goodwin's testing was

reviewed. (Tr. 246). Plaintiff's mother reported Plaintiff had not been diagnosed with ADHD given her age. Plaintiff's mother reported she observed ADHD-type symptoms. Plaintiff was reported as having difficulty finishing meals, leaving her seat often, impulsive, talkative, aggressive, and easily distracted. Plaintiff's mother reported she had difficulty taking turns. Plaintiff's mother reported Plaintiff hits others and the dog. (Tr. 246). Plaintiff was cooperative. Plaintiff left her seat early in the testing and walked about the room, but she did not exhibit acting out behaviors. Plaintiff's speech was coherent with some articulation deficits but understandable. (Tr. 247). Plaintiff was only able to identify 1 of 5 colors. Plaintiff was able to count to ten. Plaintiff did not know her age. Plaintiff missed three letters of the alphabet. (Tr. 247). Impression was rule out ADHD, rule out mild intellectual disability vs borderline intellectual functioning, and unspecified disruptive, impulse control, and conduct disorder. (Tr. 248).

On July 24, 2017, non-examining state agency consultant Dr. Waller, Ph.D. reviewed the record and found that as to the domains, Plaintiff had marked limitations in acquiring and using information, less than marked limitations in two domains, and no limitation in three domains. (Tr. 33-36). The Listing considered was 112.05. (Tr. 34). In December 2017, on reconsideration, Dr. Wright, Ph.D. affirmed this assessment. (Tr. 49).

On August 9, 2017, Plaintiff was seen by Dr. Keith. Plaintiff's mother reported Plaintiff had disturbances of thinking and emotion, starting four years and two years prior respectively. (Tr. 254). All that is noted is "at length discussion." (Tr. 256).

On October 19, 2017, there was a letter stating Plaintiff was currently enrolled in head start and did not receive any special education services. (Tr. 162).

On November 29, 2017, Plaintiff was seen by Ms. White at the Pee Dee Speech and Hearing

10

Center. (Tr. 261). Plaintiff had fair attention, good cooperation, good turn taking, good eye contact, good interaction with examiner, and good ability to follow commands. Plaintiff attended to test materials with the need for occasional redirection. Plaintiff asked multiple times if she could go play with toys and would turn away after; tactile and visual cues were used to redirect her to the test. (Tr. 261). Expressive language skills were mildly delayed; receptive language skills were average. (Tr. 261). Plaintiff was unable to demonstrate understanding of pronouns, identify shapes, and identify letters. (Tr. 261). Articulation skills were average. (Tr. 262). Plaintiff did suck her thumb throughout the test. Plaintiff had normal oral motor skills. (Tr. 262). Speech language therapy was not recommended. (Tr. 262).

**<u>2018</u>**

On January 29, 2018, Plaintiff was seen by Dr. Keith for her five year old checkup. (Tr. 335). Plaintiff "gets along well in family environment and has playmates at school. Currently, the child has no concerns about school performance." (Tr. 335). Plaintiff examined normally for behavior/psychomotor activity. (Tr. 337). Methylin was prescribed. (Tr. 337). Plaintiff was referred to another provider for expressive language disorder.

On March 13, 2018, Plaintiff was seen by Dr. Keith. (Tr. 321). Diagnosis was childhood onset type conduct disorder. (Tr. 321). Plaintiff was taking methylin. (Tr. 321).

On August 1, 2018, Plaintiff was seen by Dr. Keith for an ADHD recheck. (Tr. 314). Plaintiff had good eye contact. (Tr. 315). Plaintiff had normal speech. Diagnosis was ADHD, predominantly inattentive type. (Tr. 315). Plaintiff was prescribed clonidine .1mg tablet and methylin syrup. (Tr. 316).

In the fall of 2018, Plaintiff completed a kindergarten readiness assessment and scored

approaching performance level. (Tr. 176).

**2019**

On February 2019, Plaintiff's third nine weeks report card stated "U" with no code interpretation chart for can write name, an "S" for following rules and playing well. Plaintiff received a "-" for reading beginning sounds, counting to 100, and naming shapes. (Tr. 177). Written in is: please continue to work with her on all skills, particularly math. (Tr. 177).

On February 26, 2019, Plaintiff was seen by Dr. Davis for her six year old checkup. (Tr. 354). Plaintiff's mother thought Plaintiff was academically behind her class mates. (Tr. 354). "She has no problems with performance, has no problems with peers, enjoys school." "Currently, the child is reading at grade level, has math skills at grade level, has no concerns about learning ability, has no concerns about school performance, and has no speech issues. Plaintiff is able to take turns and follow rules. Plaintiff completes chores and gets along well in family environment." (Tr. 354). Upon exam, Plaintiff was oriented to person, place, and time. (Tr. 356). Plaintiff's mother was to contact the school for a learning disability evaluation. (Tr. 357).

On her 2018-2019 kindergarten report card for three grading periods, Plaintiff was satisfactory in all categories for all three periods, except for writing name and writing legibly. Plaintiff satisfactorily played well and followed the rules. By the third period, Plaintiff could write her name satisfactorily. (Tr. 180). After each grading period, a parent-teacher conference was requested. After the second grading period, it was noted Plaintiff was performing below grade level in math. (Tr. 180). After the third grading period, it was noted retention was possible due to not mastering math skills. (Tr. 180). Plaintiff could figure out words by listening to sounds. Plaintiff could not read beginning sounds or use sounds to write words. Plaintiff could read 9 of 62 high

12

frequency words. (Tr. 181). Plaintiff had not mastered the majority of math skills and could not count objects to 10. Plaintiff could build numbers to 5. (Tr. 181). On an addition assessment, Plaintiff only answered 1+3 =4 correctly; she answered 2+2 as 6. (Tr. 184).

On March 26, 2019, Plaintiff wrote the beginning of the sentence "When I went to the park" correctly, the remainder is unclear. (Tr. 186).

## 2019 Hearing Testimony

At the hearing on April 11, 2019, Plaintiff's mother testified first. Plaintiff's siblings were ages seven and almost five. Plaintiff was six. (Tr. 366). Plaintiff was in kindergarten. Plaintiff helped with a puppy. (Tr. 366). Plaintiff was not happy when her baby brother was born and was aggressive with him and with her sister. (Tr. 367). Plaintiff's mother testified that she was struggling and a little behind in kindergarten. Plaintiff was struggling with math and reading. Plaintiff recently was to get tested for a learning disability. (Tr. 367). The school had a cutoff date and she did not make it, so she is going to get her tested at the doctor. (Tr. 368). Plaintiff's mother reported Plaintiff could not read and she thought it was because she did not know all her letters well.  Plaintiff's mother reported the teacher just said she needs a bigger push to be where she needs to be. (Tr. 369). Plaintiff's teacher said she is a hard worker. Plaintiff's mother testified that she gets out of line "quite a few times, as in talking, and she's starting to hit other children and spit on them and stuff like that." (Tr. 370). All school had to do was threaten to call her mother and Plaintiff usually stopped what she was doing. (Tr. 370). Plaintiff started taking ADHD medication the January before. There had been no dosage increase. (Tr. 371). The medication calms her down and makes her a little drowsy. (Tr. 371). Plaintiff takes it every day.  When it wears off, Plaintiff is "back to causing trouble." (Tr. 372). It lasts six hours. Plaintiff does not stay seated long enough to finish her dinner.  Plaintiff is not

focused and just fidgety a lot. (Tr. 372). Plaintiff does not recognize a "D" from a "B," according to Plaintiff's mother. (Tr. 373). Plaintiff cannot recognize all numbers 1 through 10 written down, but she can say them. (Tr. 374). Four different adults help her with her homework. (Tr. 375). If someone is sitting with her, she will finish it. Plaintiff does not do more than five minutes. Otherwise, Plaintiff gets irritated and walks off. (Tr. 375). Plaintiff can play dress up for more than 15 minutes. Plaintiff plays by herself because she does not like her older sister bossing her. (Tr. 376). Plaintiff spit on a child at school because they were bothering her and getting on her nerves. (Tr. 377). Plaintiff slapped her grandmother in the face. (Tr. 378). Plaintiff has one friend at school. School may hold her back a grade. (Tr. 379). Plaintiff likes to dance and does not watch television at all. (Tr. 380). Plaintiff's mother testified she was still wetting herself in the bathroom at school. (Tr. 380). The doctor said it was laziness. (Tr. 381). Plaintiff puts her clothes on backwards and her shoes on the opposite feet. (Tr. 382). Plaintiff 's mother stated Plaintiff put pencils, dirt, and rocks in her mouth. (Tr. 383). Plaintiff sucks her thumb and the doctor has no concerns about it. Plaintiff can do simple chores. (Tr. 384). Plaintiff does not like change; she cried all day when there was a substitute. (Tr. 384). School does not complain about her speech. (Tr. 385).

Plaintiff testified with "ma'am" responses. (Tr. 387). Plaintiff was not sure if she knew the difference between telling a truth and a lie. Plaintiff liked school and recess. Plaintiff played with girl friends at recess. (Tr. 388). Plaintiff liked playing cheerleaders. Plaintiff played hopscotch. Plaintiff liked her teacher. Plaintiff admitted she had problems talking when she was not supposed to be talking. (Tr. 389). Plaintiff liked reading. Plaintiff had problems saying words. Plaintiff writes her name. (Tr. 389). Plaintiff counted to 22 on the record. (Tr. 290). Plaintiff's medicine made her feel funny after taking it. Plaintiff reported she felt <u>more</u> awake after taking it. (Tr. 390). Plaintiff

reported that she could hear better what people told her and listen better when she took her medicine. (Tr. 390-391). Plaintiff rides her bicycle. Plaintiff likes playing with her baby doll. (Tr. 391). Plaintiff stated she did not get into fights with her older sister or her younger brother when they played. (Tr. 392). Plaintiff helps with her dog. Plaintiff plays with her cousin. Plaintiff did not know the word on her shirt. Plaintiff can bathe, brush her teeth, and put her shirt on by herself. (Tr. 394). Plaintiff can sweep the floor. (Tr. 395). Plaintiff needs reminders. (Tr. 395).

Plaintiff's attorney argued she was "extreme" in limitation in the domain of acquiring and using information. (Tr. 397).

**C.    The ALJ's Decision**

In the decision of May 31, 2019, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant was born on January 22, 2013. Therefore, she was an older infant on March 14, 2017, the date application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).

2.    The claimant has not engaged in substantial gainful activity since March 14, 2017, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD); and, unspecified disruptive, impulse control and conduct disorder (20 CFR 416.924(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6.    The claimant has not been disabled, as defined in the Social Security Act,

since March 14, 2017, the date the application was filed (20 CFR 416.924(a)).

## II. DISCUSSION

Plaintiff argues that the ALJ erred in the medical equivalence findings; Plaintiff argues Plaintiff was markedly limited in three paragraph (B) areas of interacting with others, concentration, persistence, and maintaining pace, and in adapting and managing oneself. Plaintiff argues that the ALJ erred in the functional equivalence findings; Plaintiff argues the ALJ erred in finding less than marked limitations in the domains of attending and completing tasks, interacting and relating with others, and ability to care for herself. Defendant argues substantial evidence supports the ALJ's findings.

## A.     LEGAL FRAMEWORK

### 1.     The Commissioner's Determination–of–Disability Process: Three Step Evaluation for Individuals under Age 18

A child[4] is considered disabled for purposes of SSI if the child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). To facilitate a uniform and efficient processing of disability claims, the Administration has promulgated regulations under the Act that reduce the statutory definition of disability to a series of sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983) (discussing considerations in adult disability matter and noting "need for efficiency" in considering disability claims). The regulations set forth a three-step sequential analysis for determining whether a child is disabled for purposes of children's

---

[4] A "child" is an individual under the age of 18. *See* 42 U.S.C. § 1382c(a)(3)(C)(I).

16

SSI benefits:

> (1) Is the child engaged in any substantial gainful activity?[5] If so, benefits are denied.
> (2) Does the child have a medically severe impairment or combination of impairments?[6] If not, benefits are denied.
> (3) Does the child's impairment(s) meet,[7] medically equal, or functionally equal an impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, benefits are granted.

20 C.F.R. § 416.924(a)–(d).

To assess functional equivalence, the Commissioner assesses the interactive and cumulative effects of all of the child's impairments for which there is record evidence, including any non-severe impairments. 20 C.F.R. § 416.926a(a). First, the Commissioner considers everything the child does at home, at school, and in the community and determines what the child cannot do, has difficulty

---

[5] In determining whether a child has engaged in substantial gainful activity ("SGA"), the Commissioner uses the same rules as used for adults. *See* 20 C.F.R. § 416.924(b). SGA is work activity that is both substantial and gainful and involves doing significant physical or mental activities for pay or profit, regardless of whether a profit is realized. *Id.* § 416.972.

[6] For a child, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. 20 C.F.R. § 416.924(c).

[7] In determining whether a child's impairment meets one of the listed impairments, the Commissioner compares the symptoms, signs, and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, ... then [the child] 'is conclusively presumed to be disabled and entitled to benefits.' " *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (internal quotation and citation omitted). "For a [child] to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). It is not enough to have the diagnosis of a listed impairment; the child "must have a medically determinable impairment(s) that satisfies all of the criteria of the listing." 20 C.F.R. § 416.925(d); *see Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987) (noting it is the claimant's burden to show a medically determinable impairments and to furnish medical evidence regarding the condition).

doing, needs help doing, or is restricted from doing because of his impairment(s). 20 C.F.R. § 416.926a(b). When the Commissioner assesses the child's functional limitations, he considers all the relevant factors contained in 20 C.F.R. §§ 416.924a, 416.924b, and 416.929, including (1) how well the child can initiate and sustain activities, how much extra help he needs, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effects of the child's medications or other treatment. 20 C.F.R. § 416.926a.

Next, the Commissioner considers how the child functions in activities in terms of six domains, which are broad areas of functioning intended to capture what a child can or cannot do. § 416.926a(b)(1). These domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well being. *Id.*

Limitations are assessed by comparing the child's functioning to the functioning of children of the same age who do not have impairments. *Id.* §§ 416.924a(b)(3), 416.926a(b)(1). To establish functional equivalence, the child must have a medically determinable impairment or combination of impairments that results either in "marked" limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(a), (d).

A child has a "marked" limitation in a domain when his impairment or combination of impairments seriously interferes with his ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(I). A "marked" limitation is a limitation that is "more than moderate" but "less than extreme" and may limit only one or several activities or functions. *Id.* A child has an "extreme" limitation in a domain when his impairment or combination of impairments very seriously interferes with his ability to independently initiate, sustain, or complete activities. *Id.*

18

§ 416.926a(e)(3)(I). An "extreme" limitation is a limitation that is "more than marked," and "extreme" is the rating given to the worst limitations, although it does not necessarily mean the child experiences a total lack or loss of ability to function. *Id.*

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases *de novo* or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir.1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**B.    ANALYSIS**

**1. ALJ's Analysis of Relevant Paragraph B Criteria**

Plaintiff argues that the ALJ erred in the medical equivalence findings; Plaintiff argues Plaintiff was markedly limited in three paragraph (B) areas of interacting with others, concentration, persistence, and maintaining pace, and in adapting and managing oneself.  Plaintiff argues the second requirement of Listing 112.05(B) is that the Plaintiff must also show significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage oneself.

The ALJ only analyzed Listings Listing 112.08 (personality and impulse-control disorder) and 112.11 (neurodevelopmental disorders).  The ALJ did not specifically refer to Listing 112.05 However, the ALJ reviewed and made findings on "paragraph B" criteria that are the second part of Listing 112.05B(2) (Tr. 16).  Defendants further point to the State agency psychological consultants' determination that Plaintiff did not meet Listing 112.05. (Tr. 34, 47).

Listing 112.05(B) via 112.00(H) provides:

H. How do we document and evaluate intellectual disorder under 112.05?
1. General. Listing 112.05 is based on the two elements that characterize intellectual disorder for children up to age 18: Significantly subaverage general intellectual functioning[8] and significant deficits in current adaptive functioning.
...
3. Establishing significant deficits in adaptive functioning.
a. Definition. Adaptive functioning refers to how you learn and use conceptual, social, and practical skills in dealing with common life demands. It is your typical functioning at home, at school, and in the community, alone or among others. Under 112.05A, we identify significant deficits in adaptive functioning based on your

---

[8] Defendants concede that Plaintiff appeared to satisfy the first part of Listing 112.05B based on her full scale IQ score of 64 (Tr. 241).

dependence on others to care for your personal needs, such as eating and bathing (grossly in excess of age-appropriate dependence). We will base our conclusions about your adaptive functioning **on evidence from a variety of sources (see 112.00H3b) and not on your statements alone**. **Under 112.05B2, we identify significant deficits in adaptive functioning based on whether there is extreme limitation of one, or marked limitation of two, of the paragraph B criteria** (see 112.00E; 112.00F).

b. Evidence. Evidence about your adaptive functioning may come from:

(I) Medical sources, including their clinical observations;

(ii) Standardized tests of adaptive functioning (see 112.00H3c);

(iii) Third party information, such as a report of your functioning from a family member or your caregiver;

(iv) School records;

(v) A teacher questionnaire;

(vi) Reports from employers or supervisors; and

(vii) Your own statements about how you handle all of your daily activities.

...

e. How we consider common everyday activities.

(I) The fact that you engage in common everyday activities, such as caring for your personal needs, preparing simple meals, or driving a car, will not always mean that you do not have deficits in adaptive functioning as required by 112.05B2. You may demonstrate both strengths and deficits in your adaptive functioning. However, a lack of deficits in one area does not negate the presence of deficits in another area. When we assess your adaptive functioning, we will consider all of your activities and your performance of them.

(ii) Our conclusions about your adaptive functioning rest on the quality of your daily activities and whether you do them age-appropriately. If you receive help in performing your activities, we need to know the kind, extent, and frequency of help you receive in order to perform them. We will not assume that your ability to do some common everyday activities, or to do some things without help or support, demonstrates that your mental disorder does not meet the requirements of 112.05B2. (See 112.00D regarding the factors we consider when we evaluate your functioning, including how we consider any help or support you receive.)

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listings 112.05, 112.00(H), (eff. before March 27, 2017)(emphasis added).

Listings 112.00E and F more thoroughly describe the paragraph B criteria:

E. What are the paragraph B criteria for children age 3 to the attainment of age 18?

1. **Understand, remember, or apply information (paragraph B1)**. This area of mental functioning refers to the abilities to learn, recall, and use information to

perform age-appropriate activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing an activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make decisions. These examples illustrate the nature of the area of mental functioning. We do not require documentation of all of the examples. How you manifest this area of mental functioning and your limitations in using it depends, in part, on your age.

2. **Interact with others (paragraph B2)**. This area of mental functioning refers to the abilities to relate to others age-appropriately at home, at school, and in the community. Examples include: Engaging in interactive play; cooperating with others; asking for help when needed; initiating and maintaining friendships; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples. How you manifest this area of mental functioning and your limitations in using it depends, in part, on your age.

3. **Concentrate, persist, or maintain pace (paragraph B3).** This area of mental functioning refers to the abilities to focus attention on activities and stay on task age-appropriately. Examples include: Initiating and performing an activity that you understand and know how to do; engaging in an activity at home or in school at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while engaged in an activity or task; changing activities without being disruptive; engaging in an activity or task close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at school; and engaging in activities at home, school, or in the community without needing an unusual amount of rest. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples. How you manifest this area of mental functioning and your limitations in using it depends, in part, on your age.

4. **Adapt or manage oneself (paragraph B4).** This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in age-appropriate activities and settings. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable performance in community- or school-related activities; setting goals; making plans independently of others; maintaining personal hygiene; and protecting yourself from harm and exploitation by others. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples. How you manifest this area of mental

functioning and your limitations in using it depends, in part, on your age.

F. How do we use the paragraph B criteria to evaluate mental disorders in children?
...
3. Rating the limitations of your areas of mental functioning.
a. General. We use all of the relevant medical and non-medical evidence in your case record to evaluate your mental disorder: The symptoms and signs of your disorder, the reported limitations in your activities, and any help and support you receive that is necessary for you to function. The medical evidence may include descriptors regarding the diagnostic stage or level of your disorder, such as "mild" or "moderate." Clinicians may use these terms to characterize your medical condition. However, these terms will not always be the same as the degree of your limitation in a paragraph B area of mental functioning.
b. Areas of mental functioning in daily activities. You use the same four areas of mental functioning in daily activities at home, at school, and in the community. With respect to a particular task or activity, you may have trouble using one or more of the areas. For example, you may have difficulty understanding and remembering what to do; or concentrating and staying on task long enough to do it; or engaging in the task or activity with other people; or trying to do the task without becoming frustrated and losing self-control. Information about your daily functioning in your activities at home, at school, or in your community can help us understand whether your mental disorder limits one or more of these areas; and, if so, whether it also affects your ability to function age-appropriately.
c. Overall effect of limitations. Limitation of an area of mental functioning reflects the overall degree to which your mental disorder interferes with that area. The degree of limitation does not necessarily reflect a specific type or number of activities, including activities of daily living, that you have difficulty doing. In addition, no single piece of information (including test results) can establish whether you have extreme or marked limitation of an area of mental functioning.
d. Effects of support, supervision, structure on functioning. The degree of limitation of an area of mental functioning also reflects the kind and extent of supports or supervision you receive (beyond what other children your age without impairments typically receive) and the characteristics of any structured setting where you spend your time, which enable you to function. The more extensive the support you need from others (beyond what is age-appropriate) or the more structured the setting you need in order to function, the more limited we will find you to be (see 112.00D).
...
(I) To do an age-appropriate activity, you must be able to understand and remember and apply information required by the activity. Similarly, you must be able to concentrate and persist and maintain pace in order to complete the activity, and adapt and manage yourself age-appropriately. Limitation in any one of these parts (understand or remember or apply; concentrate or persist or maintain pace; adapt or manage oneself) may prevent you from completing age-appropriate activities.

...

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listings 112.00E,F.(eff. before March 26, 2017)(emphasis added).

Plaintiff argues Plaintiff was markedly limited in three paragraph (B) areas of interacting with others, concentration, persistence, and maintaining pace, and in adapting and managing oneself.

The ALJ found moderate limitations in the three criteria at issue: interacting with others, concentration, persistence, and maintaining pace, and adapting or managing oneself, in one composite finding. (Tr. 16).

In finding Plaintiff's mental impairments were not of listing level severity, i.e., not two "marked"s and not one "extreme," the ALJ relied on the following. The ALJ reviewed and considered Plaintiff's mother's reports of difficulty communicating, understanding, and paying attention, citing Exhibit 2E, a function report from March 2017. (Tr. 16, 132). The ALJ considered intellectual testing where Plaintiff scored in the extremely low to borderline range. (Tr. 16). However, the ALJ noted that despite the allegations, Plaintiff's most recent progress reports showed satisfactory progress in "following directions, playing, self-control, finishing tasks, and listening," citing Exhibit 15E, some of Plaintiff's school records. (Tr. 16, 180-186). The ALJ noted as summarized elsewhere in the opinion that Plaintiff "generally presented with no problems with attention and concentration, especially after starting medication, citing Exhibits 1F, 3F, 7F, 8F, and 9F, (all as summarized by the court above), therapy notes, Dr. Ways' examination, and pediatrician Dr. Keith's notes.  (Tr. 16, 190-236,245-248, 290-358). The ALJ noted "claimant remains able to get along with her siblings, play at recess in school, make and play with friends, ride a bicycle, and help take care of her dog." (Tr. 16, 180, 335, 340, 378, 388, 391-392). The ALJ noted Plaintiff's

24

hearing testimony that she was able to answer questions and provide explanations at the hearing. (Tr. 16, 387-395). The ALJ then concluded: "The performance of these activities necessarily require at least a minimal capacity to recall and use information, relate to others, stay on task at a sustained rate, and maintain well-being. For these reasons, the claimant's mental impairments do not result in one "extreme" limitation of one or "marked" limitations in two of the functional areas." (Tr. 16).

Plaintiff's arguments rely in part on Plaintiff's mother's reports. The ALJ noted Plaintiff's mother was only given some weight as it was inconsistent[9] with the medical evidence of record. (Tr. 18). Plaintiff asserts that Plaintiff's counselor documented that Plaintiff does not get along well with others. (ECF No. 24 at 14). However, as summarized above, counseling records are mixed and do show a plethora of sessions in which Plaintiff does get along with siblings and the counselor. (Tr. 286, 281, 279, 277, 270, 268, 194, 196, 200, 202, 223, 227, ). Plaintiff asserts Plaintiff's testimony cannot be relied on because Plaintiff could be lying when testifying. (ECF No. 24 at 15). Plaintiff cites Dr. Goodwin's and Dr. Way's evaluations to argue Plaintiff had "marked" limitations in concentration, persistence, or maintaining pace. (ECF No. 24 at 16-17). Elsewhere in the opinion, the ALJ noted that "the claimant generally presented as cooperative during examinations and was noted to be easily redirected in school." (Tr. 18).

The standard of review here is not whether conflicting evidence might have resulted in a contrary decision, but it is whether substantial evidence supports the ALJ's decision. Even with some evidence of abnormal findings, the ALJ provided more than a mere scintilla of record support

---

[9] Plaintiff's treating pediatrician Dr. Keith noted Plaintiff played interactively with peers, dressed herself, got along well in the family environment, had no concerns about school performance, and had normal behavior exams. (Tr. 344, 346, 340, 342, 335, 337).

for the paragraph B findings. The court does not weigh again evidence already weighed by the ALJ. The ALJ complied with the applicable regulations in making clear to a subsequent reviewer the reasons for the findings made. The ALJs decision was based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

## 2. ALJ's Analysis of Relevant Domains

Plaintiff argues that the ALJ erred in the functional equivalence findings; Plaintiff argues the ALJ erred in finding less than marked limitations in the domains of interacting and relating with others, attending and completing tasks, and ability to care for herself.

### "Interacting and Relating With Others" Domain

With respect to this domain, the Commissioner considers how well the child can initiate and sustain emotional connections with others, develop and use the language of his community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others. *Id.* § 416.926a(I). Generally, the child must be able to speak intelligibly and fluently so that others can understand him; participate in verbal turntaking and nonverbal exchanges; consider others' feelings and points of view; follow social rules for interaction and conversation; and respond to others appropriately and meaningfully. *Id.* A child with limitations[10] in this domain may

---

[10] Examples of limited functioning in Interacting and Relating With Others include: (I) inability to reach out to be picked up or held by caregiver; (ii) no close friends or friends are all older or younger than the child; (iii) avoids or withdraws from people the child knows or is overly anxious or fearful of meeting new people or trying new experiences; (iv) difficulty playing games or sports with rules; (v) difficulty communicating with others; e.g., in using verbal and nonverbal skills to express himself, carrying on a conversation, or in asking others for assistance; (vi) difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i)(3).

have various kinds of difficulties. For example, the child may not understand how to: approach other children, initiate and sustain social exchanges, and develop meaningful relationships with others. SSR 09-5p.

> The ALJ further cited the rules regarding older infants/toddlers/preschoolers:
>
> Social Security rules provide that an older infant or toddler without an impairment is dependent upon caregivers, but should begin to separate from them. The child should be able to express emotions and respond to the feelings of others. The child should begin initiating and maintaining interactions with adults, but also show interest in, then play alongside, and eventually interact with other children of the same age. The child should begin to understand the concept of "mine" and "his" or "hers." The child should be able to spontaneously communicate his wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know he can understand the child most of the time (20 CFR 416.926a(i)(2)(ii) and SSR 09-5p).
>
> Social Security rules provide that a preschooler without an impairment should be able to socialize with children as well as adults. The child should begin to prefer playmates and start developing friendships with children who are his own age. The child should be able to use words instead of actions to express himself and also be better able to share, show affection, and offer to help. The child should be able to understand and obey simple rules most of the time, and sometimes asks permission. The child should be able to relate to caregivers with increasing independence, choose her own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. The child should he able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what she says most of the time (20 CFR 416.926a(i)(2)(iii) and SSR 09-Sp).

(Tr. 21).

The ALJ cited and relied on substantial evidence that supports the ALJ's findings that Plaintiff had "less than marked" limitations in the domain of Interacting and Relating with Others. (Tr. 21-22). The ALJ stated Plaintiff had some limitation in this domain. The ALJ considered Plaintiff's mother's testimony that Plaintiff hit others. (Tr. 22, 370). Despite such testimony, the most recent progress report

showed "satisfactory progress in following directions, playing, self-control, finishing tasks, and listening," citing Exhibit 15E, school records. (Tr. 22, 180-184). Plaintiff testified herself that she gets along with her siblings and friends. (Tr. 22, 388). The ALJ noted therapy notes of stabilization and Plaintiff's exams generally showing Plaintiff was cooperative. (Tr. 22, 248, 194, 266, 279, 281). The ALJ further relies on the non-examining consultants finding the same. (Tr. 22, 33-36).

Substantial evidence supports the ALJ's findings that Plaintiff had less than marked limitations in the domain of Interacting and Relating with Others. While the record contains facts in favor of both limitations and a lack of limitations, the commissioner and not the court is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence might permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ performed the analysis as required by the applicable guidelines, regulations, and policies, and substantial evidence supports the ALJ's decision.

### **"Attending and Completing Tasks" Domain**

For this domain, the Commissioner considers how well the child is able to focus and maintain her attention and how well she can begin, carry through, and finish activities, as well as the pace at which she can perform activities and the ease with which she can change them. 20 C.F.R. § 416.926a(h). As with the other domains, limitations[11] in this domain are determined based on various age group descriptors. *Id.* § 416.926a(h)(2).

The ALJ further cited the rules regarding older infants/toddlers/preschoolers:

---

[11] Examples of limited functioning in Attending and Completing Tasks include: (i) being easily startled, distracted, or overreactive to sounds, sights, movements, or touch; (ii) slow to focus on, or fail to complete, activities of interest, e.g., games or art projects; (iii) repeatedly sidetracked from activities or frequently interrupt others; (iv) easily frustrated and give up on tasks, including ones the child is capable of completing; and (v) requires extra supervision to keep engaged in an activity. 20 C.F.R. § 416.926a(h)(3).

Social Security rules provide that an older infant or toddler without an impairment should be able to attend to things that interest her ( e.g., looking at picture books, listening to stories), and have adequate attention to complete some tasks ( e.g., putting a toy away). As a toddler, she should demonstrate sustained attention, such as when building with blocks, and when helping to put on her clothes (20 CFR 416.926a(h)(2)(ii) and SSR 09-4p).

Social Security rules provide that a preschooler without an impairment should be able to pay attention when she is spoken to directly, sustain attention to her play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. The child should also be able to focus long enough to do many more things independently, such as gathering clothes and dressing, feeding, or putting away toys. The child should usually be able to wait her turn and to change her activity when a caregiver or teacher says it is time to do something else. The child should be able to play contentedly and independently without constant supervision (20 CFR 416.926a(h)(2)(iii) and SSR 09-4p).

(Tr. 20).

The ALJ cited and relied on substantial evidence that supports the ALJ's findings that Plaintiff had "less than marked" limitations in the domain of Attending and Completing Tasks. The ALJ acknowledged Plaintiff had some limitations in this domain. (Tr. 20). The ALJ considered Plaintiff's mother's testimony that Plaintiff was very distractible and had trouble learning due to her learning disability. (Tr. 20, 372). The ALJ noted that notwithstanding that testimony, the most recent school progress report showed "satisfactory progress in following directions, playing, self-control, finishing tasks, and listening," citing Exhibit 15E. (Tr. 20-21, 180-186). The ALJ further cited treating records and consultative examiner records at Exhibits 1F, 3F, 7F, 8F, and 9F, noting that Plaintiff generally presented with no problems with attention and concentration, especially after starting medication. (Tr. 21, 190-236, 245-248, 290-358). The ALJ also noted non-examining state agency consultants had made the same "less than marked" finding. (Tr. 21, 33-36).

Substantial evidence supports the ALJ's findings that Plaintiff had less than marked limitations in this domain.

**Caring for Yourself Domain**

For this domain, the Commissioner considers how well a child maintains a healthy emotional and physical state, like how well a child satisfies her physical and emotional wants/needs in appropriate ways. This domain is also about how the child copes with stress and changes in the environment and how well the child takes care of her own health, possessions, and living area. 20 CFR 416.926a(k); SSR 09-7p.

Examples of limited functioning in this domain are: (i) continues to place non-nutritive or inedible objects in the mouth ( e.g., dirt, chalk); (ii) often uses self-soothing activities that are developmentally regressive ( e.g., thumb-sucking or re-chewing food); (iii) does not feed, dress, toilet, or bathe self age-appropriately; (iv) engages in self injurious behavior ( e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take medication), or ignores safety rules; (v) does not spontaneously pursue enjoyable activities or interests ( e.g., listening to music, reading a book); (vi) has restrictive or stereotyped mannerisms (e.g., head banging, body rocking); or (vii) has disturbances in eating or sleeping patterns. 20 CFR 416.926a(k)(3); SSR 09-7p.

The ALJ cited the rules regarding older infants/toddlers/preschoolers:

Social Security rules provide that an older infant or toddler without an impairment should be trying to do more things for herself that increase her sense of independence and competence in her environment as she grows. The child might console herself by carrying a favorite blanket. The child should be learning to cooperate with her caregivers, but the child should also want to show what she can do ( e.g., pointing to the bathroom or pulling off a coat). The child should be experimenting with her independence by showing some degree of contrariness ( e.g., "No! No!") and declaring her own identity (e.g., hoarding toys). Children this age typically insist on trying to feed themselves (20 CFR 416.926a(k)(2)(ii) and SSR 09-7p).

Social Security rules provide that a preschooler without an impairment should want to take care of many of her own physical needs ( e.g., putting on shoes, getting a snack), and also want to try doing some things that she cannot do fully ( e.g., tying shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range,

it may be easy for the child to agree to do what her caregiver asks. Later, that may be difficult for the child because she wants to do things her way or not at all. These changes usually mean that the child is more confident about her ideas and what she is able to do ( e.g., wants to use toilet, feed self independently). The child should also begin to understand how to control behaviors that are not good for herself(e.g., crossing the street without an adult) (20 CFR 416.926a(k)(2)(iii) and SSR 09-7p).

(Tr. 23-24).

The ALJ cited and relied on substantial evidence that supports the ALJ's findings that Plaintiff had "less than marked" limitations in this domain. The ALJ considered Plaintiff's mother's testimony that Plaintiff had toilet accidents in school and was unable to tie her shoes or dress herself correctly. (Tr. 24, 380, 382). The ALJ noted Plaintiff was able to bathe herself, feed herself, and put her toys away.[12] The ALJ considered Plaintiff's testimony that she enjoyed singing and playing cheerleader with her friends. (Tr. 24, 388). Noteworthy, the ALJ considered that the state agency non-examining consultants found "no limitation" in this domain and thus their determinations were given less weight because there was support in the record for a "less than marked" limitation. (Tr. 24, 22-36).

Substantial evidence supports the ALJ's findings that Plaintiff had "less than marked limitations" in these domains. The question is not whether the evidence could support a finding of "marked" limitations, but whether the evidence does support the finding of "less than marked" limitations. Again, while the record contains facts in favor of both limitations and a lack of limitations, the commissioner, not the court, is charged with resolving conflicts in the evidence, and this Court

---

[12] Further, the records shows Dr. Keith noted in March of 2017 that Plaintiff dressed herself. (Tr. 340). June 2016 notes showed Plaintiff was fully potty trained. (Tr. 344). On January 29, 2018, Dr. Keith stated Plaintiff "gets along well in family environment and has playmates at school. Currently, the child has no concerns about school performance." (Tr. 335). In February 2019, Dr. Davis noted "Plaintiff completes chores and gets along well in family environment." (Tr. 354). There are no notes of Plaintiff's mother complaining to treating providers that Plaintiff stuck inedible objects in her mouth as reported on SSA forms and as relevant to this particular domain.

cannot reverse that decision merely because the evidence might permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). The ALJ considered the evidence and performed the analysis as required by the applicable guidelines, regulations, and policies, and substantial evidence supports the ALJ's decision.

### III.  CONCLUSION

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence. *Richardson*, 402 U.S. at 390. Even where the Plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock*, 483 F.2d at 775. The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion. *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). As previously discussed, despite the Plaintiff's claims, she has failed to show that the Commissioner's decision was not based on substantial evidence. Based upon the foregoing, and pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), the Commissioner's decision is AFFIRMED.


                                                    s/ Thomas E. Rogers, III
May 21, 2021                                         Thomas E. Rogers, III
Florence, South Carolina                            United States Magistrate Judge

32